IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 12 CR 459 |
| | ) | (20 CV 01792) |
| v. | ) | |
| | ) | |
| | ) | Hon. Judge Gary Feinerman |
| JOSEPH MARIO MORENO | ) | |

**DEFENDANT MORENO'S EMERGENCY MOTION FOR
COMPASSIONATE RELEASE OR RECOMMENDATION FOR
IMMEDIATE HOME CONFINEMENT**

JOSEPH MARIO MORENO, by and through his attorney RICHARD KLING, and Illinois Supreme Court Rule 711-Certified Law Student BENJAMIN JAMBOIS, respectfully moves this Court to grant his motion for compassionate release under the First Step Act, 18 U.S.C. § 3852(c)(1)(A)(i), or in the alternative, a recommendation to the BOP that he be transferred to home confinement immediately pursuant to § 12003(b)(2) of the CARES Act and 18 U.S.C. § 3621(b)(4). In this case, there are extraordinary and compelling reasons to grant relief because Mr. Moreno's advanced age—67 years old—and serious health conditions (a long history of hypertension, anemia, cancerous tumors, glaucoma, and complications from prior contraction of tuberculosis and polio and cigarette smoking for 40 plus years) mean that he faces a significant risk of death or serious injury from COVID-19.

1

Mr. Moreno is classified by the Bureau of Prisons as "Chronic Care Level II", due to significant hypertension, diabetes, and glaucoma problems.[1] The medical team at Mr. Moreno's facility has been unable to successfully manage his myriad of illnesses which substantially diminishes his ability to function within the correctional facility. Based on his age and his health conditions, the Centers for Disease Control calculates that Mr. Moreno is in the highest possible risk group for serious complications or death, should he get infected with COVID-19.[2]

If this Court granted compassionate release, Mr. Moreno would pose no danger to the community at large. Mr. Moreno is a nonviolent, first-time offender, who is currently serving a sentence for one count of conspiracy to commit extortion. At present, Mr. Moreno is at FPC Duluth, which is a minimum security camp. The BOP has rated Mr. Moreno as representing a "minimal" risk of recidivism, which is the lowest possible level on their scale. *See* Exh. A, FPC Duluth First Step Act Eligibility and Recidivism Risk Level Review.

Accordingly, Mr. Moreno requests that this Court grant him compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), because his serious health conditions and vulnerability to COVID-19 infection are "extraordinary and compelling reasons" that support a reduction in his sentence.

**BACKGROUND**

**I.      Factual and Procedural History**

On February 24, 2014, Mr. Moreno was sentenced to 132 months in prison after pleading guilty to one count of conspiracy to commit extortion. At present, he has been in custody for more than 60 months. *See* Exh. B, Summary Reentry Plan at 1-3. Accounting for an extra 9.9

---

[1] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf
[2] *People Who Are at Higher Risk*, Ctr. for Disease Control & Prevention, Apr. 7, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

months of good time credit, he has served approximately fifty-three percent (53%) of his sentence. According to his Individualized Reentry Plan, the Bureau of Prisons currently expects to release Mr. Moreno on January 1, 2024. Given the COVID-19 crisis in the BOP, Attorney General William J. Barr has relaxed home confinement eligibility and, as a result, Mr. Moreno is eligible for immediate release to home confinement.

This motion does not seek to challenge, in any way, the original sentencing decision made by this Court. Although the Court imposed a significant sentence in Mr. Moreno's case, there is no indication that the Court intended to impose a death sentence. Given Mr. Moreno's age and his increased vulnerability to COVID-19, the defense believes that the ends of justice in this case would be best achieved by allowing Mr. Moreno to return home, rather than requiring him to run the risk of death or serious illness while in BOP custody.

In considering whether to grant Mr. Moreno compassionate release, the Court should consider the progress that he has made since sentencing occurred over six years ago. Mr. Moreno has been a model inmate. He has actively participated in the camp's inmate education program and has taken approximately 75 educational courses, including several that specifically focus on reentry skills. *See* Exh. B, Summary Reentry Plan at 1-3. More importantly, Mr. Moreno has taught several classes for over three years, including. Toastmasters International (public speaking), Health and Nutrition, Positive Mental Attitude, History of the Ancient World, Life Lessons from the Great Books, Astrophysics and Cosmology, Drivers License Workshops, and Goal Setting, as well as assisting Spanish-speaking residents in reading and speaking. *See* Exh. B, Summary Reentry Plan at 1.

Mr. Moreno has also taken jobs in the facility's kitchen and law library. Currently, he works in the facility as a Compound Orderly and in the Recreation Department. His re-entry

plan states that "inmate Moreno has consistently earned average and above average work evaluations during this period of incarceration." *See* Exh. B, Summary Reentry Plan at 1. The re-entry plan goes on to state that Mr. Moreno has gained employable work skills through his employment in the Recreation department of the facility. Mr. Moreno has continuously made voluntary contributions through the BOP's inmate financial responsibility program. *See* Exh. B, Summary Reentry Plan at 4. He has paid the full $142,000 of his restitution despite having to file for bankruptcy. *See* Exh. B, Summary Reentry Plan at 4. In all, Mr. Moreno's prison record reflects the fact that he has worked hard to rehabilitate himself and to prepare to lead a successful and law-abiding life.

Immediate release is all the more appropriate because this offense occurred nearly eight years ago when Mr. Moreno was a Cook County Commissioner. Mr. Moreno will never be able to hold any type of public office again, or practice law. All of the circumstances of Mr. Moreno's life at the time of the offense and his behavior since, lower his risk of reoffending under § 3582(c)(1)(A)(ii).

## II. Mr. Moreno's Age and Health Problems Place Him at High Risk for Death from COVID-19.

To prevent Mr. Moreno's sentence for conspiracy to commit extortion from becoming a death sentence, he respectfully requests this Court to immediately enter an order reducing his sentence to time served. Mr. Moreno faces a significantly heightened risk of a serious or fatal COVID-19 infection on account of his age alone. In the United States, 80% of reported deaths

from COVID-19 have been in adults who are age 65 or older.[3] A recent study in New York found that—even without considering other risk factors—more than one third of men in Mr. Moreno's age group die of COVID-19 after being admitted to the hospital. Older adults are also far more likely to be hospitalized in the first place.[4] The Centers for Disease Control and Prevention (CDC) estimates that 31–59% of adults ages 65–84 with COVID-19 will require hospitalization and a significant portion will require intensive care.[5] The Intensive Care National Audit and Research Centre in London reports that 56.4% of those between the ages of 60-69 admitted to the ICU as a result of COVID-19 died there.[6]

While those numbers are stark, Mr. Moreno's risk is even greater than that of a typical person his age because he suffers from a number of preexisting health conditions that are associated with particularly severe COVID-19 infections. For one, Mr. Moreno is diagnosed with hypertension and currently takes nine (9) medications to manage his various degenerative age related problems. There is a medical consensus that "[p]eople with cardiovascular disease face more life-threatening complications and a substantially higher risk of death from the new coronavirus."[7]

These risks are particularly acute for Mr. Moreno, because the BOP has already proven incapable of successfully managing his hypertension. At present, the BOP classifies Mr. Moreno as Chronic Care Level II because his hypertension, glaucoma, diabetes, and nine

---

[3] *Older Adults*, Ctr. for Disease Control & Prevention, Apr. 7, 2020,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.
[4] *Id.*
[5] *Id.*
[6] ICNARC Report on COVID-19 in Critical Care, ICNARC, Apr. 10, 2020, https://tinyurl.com/smfm6zf.
[7] Betsy McKay, *Heart Conditions Prove Especially Dangerous for COVID-19 Patients*, The Wall Street Journal, Apr. 12, 2020, www.wsj.com/amp/articles/heart-conditions-prove-especially-dangerous-for-covid-19-patients-
11586683801 (noting that even mild cases of hypertension can increase risk)

5

separate medications needed to manage his comorbidity of conditions.[8] In Mr. Moreno's case, too, the presence of multiple risk factors means that he is at far greater risk than are people who only have a single condition.

### III.    Mr. Moreno Has a Solid Release Plan That Will Protect His Health And Ensure the Safety of the Community.

If released from custody, Mr. Moreno would live with his sister in-law at 5224 S. Mayfield Ave. in Chicago, Illinois. There will be no other people living in the home besides Mr. Moreno and his sister-in-law. The Probation Department has done an inspection on this residence and determined it to be suitable. Mr. Moreno has a thorough plan to financially support himself. He plans to collect social security payments and work at a job helping people get their driver's licenses reinstated.

### ARGUMENT

Mr. Moreno meets the criteria for compassionate release because his age and medical conditions mean that he is highly vulnerable to COVID-19. Releasing him will not only potentially save his life, but will also protect the inmates and staff at FPC Duluth as well as the broader community. "When officers and staff members who work in prisons get infected, they will bring the virus home to their families."[9] A chorus of public health experts have confirmed that releasing more "people will protect the community from COVID-19: "We must protect public safety. But, today, there is no greater threat to public safety than the coronavirus."[10]

---

[8] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf
[9] Mary Bassett et al., *Andrew Cuomo, Stop a Coronavirus Disaster: Release People from Prison*, NY Times, Mar. 30, 2020, https://www.nytimes.com/2020/03/30/opinion/nyc-prison-release- covid.html.
[10] *Id.*; *see also* Letter from the Justice Collaborative to Donald J. Trump, President of the United States, Mar. 27, 2020, https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public- Health-Expert-Letter-to-Trump.pdf ("[W]e ask that you commute sentences for all elderly people.... [O]lder people are at

## I.  This Court Should Grant Mr. Moreno Compassionate Release and Reduce His Sentence Pursuant to the First Step Act

In 2018, the First Step Act modified the compassionate release statute to end the BOP's gatekeeping function and to allow inmates to directly file compassionate release motions in certain circumstances. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Under the First Step Act, the Court may grant an inmate's motion for a sentencing reduction if three requirements have been satisfied. First, the Court must determine either that (a) the defendant "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or that (b) 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility. *Id.* Second, the Court must determine that "extraordinary and compelling reasons warrant such a reduction…and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). Third, the Court may reduce a defendant's sentence after determining that the reduction is consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a). *Id.*

### A. Mr. Moreno has satisfied the exhustion requirement because more 30 days have passed since he first submitted a request for Compassionate Release to the Warden of FPC Duluth, and his request was denied.

Even before COVID-19 presented a significant threat to his health, Mr. Moreno submitted a compassionate release request to the warden of FPC Duluth on February 23, 2019. *See* Exh. C, Mr. Moreno's Request for Compassionate Release. His application was forwarded to the Central Office on March 13, 2019. *See* Exh. D, Warden Review. His application was ultimately denied on July 15, 2019. *See* Exh. E, Office of the General Counsel Denial. He again made a

---

a higher risk of getting severe COVID-19 disease and dying.... Also, older people who are released from prison pose little risk to public safety.").

request for compassionate release. Under the statute, because 30 days have lapsed since the warden received and denied Mr. Moreno's request and the Bureau of Prisons has not filed a compassionate release motion on Mr. Moreno's behalf, Mr. Moreno is entitled to pursue compassionate release in this Court. *See 18* U.S.C. § 3582(c)(1)(A) (the Court may rule on compassionate release "upon motion of the defendant after…the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility").

B. **Mr. Moreno is eligible for compassionate release because his heightened vulnerability to COVID-19 is an extraordinary and compelling circumstance that weighs in favor of immediate release.**

As Mr. Moreno has satisfied the exhaustion requirement, the First Step Act empowers this Court to make an independent determination as to whether there are "extraordinary and compelling reasons" for compassionate release. The Court is no longer required to defer to the BOP's determination of whether such circumstances exist. *See, e.g.*, United *States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose."); *United States v. Cantu*, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (same).

Rather than deferring to the BOP, the First Step Act directed courts to consider whether the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As a number of courts have noted, the Sentencing Commission has not issued any applicable policy statements since the passage of the First Step Act. *See, e.g.*, *United States V. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019) ("By its terms, the old policy statement applies to motions for compassionate release filed by the BOP Director and makes no mention of motions filed by defendants."). Nevertheless, courts have

found that the old policy statement provides helpful guidance in determining whether a defendant is eligible for compassionate release. *See id.*; United *States v. Ebbers*, No. S402CR11443VEC, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

The old policy statement issued by the Sentencing Commission listed four conditions that would constitute "extraordinary and compelling reasons" to reduce a sentence. U.S.S.G. § 1B1.13 cmt. n.1(A)-(D). While the first three conditions set out precise criteria for eligibility, the Sentencing Commission recognized the limits of that mechanical approach and included a "catch-all" provision designed to cover "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

Since the passage of the First Step Act, courts have found that they may rely on this "catch-all" provision to determine eligibility, even in cases where the BOP has made no determination regarding an inmate's eligibility for compassionate release. *See, e.g.*, *United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, at *2 (N.D. Ill. Apr. 3, 2020) (Leinenweber, J.)(granting compassionate release motion under the catch-all provision in the absence of any BOP finding regarding eligibility); *United States v. Owens*, No. 97-CR-2546-CAB, ECF No. 93 at 4 (S.D. Cal. Mar. 20, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence—and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D). . . .") (collecting cases); United *States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)- (C)...."). As a result, the policy statement in the Sentencing Guidelines does not prevent this Court from making an

independent determination that the COVID-19 pandemic is an extraordinary and compelling reason justifying early release.

   i.    *COVID-19's rapid spread through the BOP system is an unprecedented public health crisis.*

As of April 30, 2020, 1,031,659 people in the United States had been diagnosed with COVID-19 and 60,057 people have died of the disease.[11] The COVID-19 death toll includes at least 34 federal inmates.[12] The President of the United States has declared that the pandemic is a national emergency and has issued guidance advising everyone in the United States to "work or engage in schooling from home whenever possible" and to "avoid social gatherings in groups of more than 10 people."[13] Prisons and jails are especially susceptible to the rapid spread of coronavirus.[14] Despite the BOP's efforts to limit the spread of COVID-19, the virus continues to spread rapidly throughout BOP facilities. As of April 30, 2020, the BOP has confirmed that 1,692 federal inmates and 349 BOP staff have tested positive for COVID-19.[15] Even these numbers are likely a drastic undercount of the extent of the infection. *Wilson v. Williams*, 20-CV-794 (N.D. Ohio Apr. 22, 2020) (ECF 22 at 3) ("it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates")

---

[11] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, Apr. 27, 2020, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[12] *COVID-19 Coronavirus page*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp.

[13] The President's Coronavirus Guidelines for America, Mar. 16, 2020, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus- guidance_8.5x11_315PM.pdf

[14] Joseph A. Bick, Infection *Control in Jails and Prisons,* 44 Clinical Infectious Diseases 1047, 1055 (2007) at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise")

[15] *COVID-19 Coronavirus Page*, Federal Bureau of Prisons, Apr. 30, 2020, https://www.bop.gov/coronavirus/index.jsp.

ii.     FPC Duluth has failed to take adequate steps to slow or prevent
        COVID-19 spread.

At present, although there are no confirmed coronavirus cases at FPC Duluth, as judges in this district have already noted, "the fact that there have been no confirmed cases of coronavirus diseases at [a BOP facility] . . . is not the same as saying that the institution is coronavirus-free or that there is no risk to [the defendant]." *United States v. Manning*, 15-cr-50007 (N.D. Ill. Apr. 20, 2020) (Kennelly, J.) (ECF 90 at 3). Other prisons around Minnesota have already begun to face coronavirus outbreaks.[16] The BOP's Residential Reentry Center in Minneapolis just announced three COVID-19 cases on April 23, 2020.[17]Furthermore, according to the Minnesota Department of Health's latest state specific COVID-19 modelling, the state is not expected to hit peak cases until July 13.[18]

Mr. Moreno's current living situation demonstrates that the protective measures being taken by FPC Duluth are inadequate to prevent COVID-19 from emerging in the facility. Mr. Moreno is currently housed in a 225 square foot cell with three other people. Meals are still eaten communally and computers and phones are not sanitized or wiped down between uses by different inmates. Under these circumstances, the further spread of COVID-19 is a virtual certainty.

While FPC Duluth claims to be taking measures to "quarantine" symptomatic inmates, courts have already found similar "quarantine" measures at other institutions to be ineffective.

---

[16] Liz Sawyer, *As COVID-19 Spreads, Pressure Mounts to Release Nonviolent, Vulnerable Prisoners in Minnesota*, Star Tribune, Apr. 14, 2020, https://www.startribune.com/as-coronavirus-spreads-pressure-mounts-to-release-nonviolent- vulnerable-prisoners/569447792/ (noting outbreaks at Red Wing juvenile facility and at Moose Lake Prison, which is only fifty miles from Mr. Moreno's facility in Duluth).
[17] *COVID-19 Coronavirus Page*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp.
[18] Stefan Gildemeister, Eva Enn, Shalini Kulasingam, Minnesota Department of Health, *SARS-CoV-2 (COVID-19) Modeling*, Apr. 16, 2020, https://mn.gov/covid19/assets/MNmodel_PPT_tcm1148-427787.pdf, at 13 (noting that the state expects to experience 22,000 deaths from the crisis).

*Wilson v. Williams*, 20-cv-794 (N.D. Ohio Apr. 22, 2020) (ECF 22 at 2-4) (describing Elkton's modified operation plan and concluding that such steps are insufficient to stop further spread of COVID-19); *see also United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020) (finding that so-called "quarantine" will be ineffective because defendant "is housed with many other people in conditions that will inevitably permit the virus to spread."). Given FPC Duluth's remote location in northern Minnesota, an outbreak of the disease would be particularly dangerous there.[19]

> *iii. Given Mr. Moreno's age and poor health, this public health crisis is an extraordinary and compelling reason justifying compassionate release.*

Health statistics show that contracting COVID-19 would quite possibly be a death sentence for Mr. Moreno.[20] His age alone puts him at significant risk and, as discussed above, Mr. Moreno's risk is further heightened by his hypertension and diabetes. *See supra* at 4-6. And, as great as the risk Mr. Moreno faces would be under normal circumstances, in prison he cannot practice social distancing or proper hygiene. Similarly, his ability to go to a hospital or get tested (and treated) early is curtailed by the very fact of him being in custody. As a result, Mr. Moreno is at a far greater risk of death or serious injury than he would be if he were released from custody.[21]

In comparable cases involving elderly and vulnerable defendants, courts have found that the COVID-19 pandemic is an extraordinary and compelling reason justifying a sentence

---

[19] Paul John Scott, *New Data Puts Minnesota Coronavirus Peak in Summer, with Supplies Uncertain*, Duluth News Tribune, Apr. 8, 2020 (noting state health commissioner's concerns regarding "smaller number of hospital beds and other resources in rural Minnesota")

[20] Safiya Richardson, Jamie S. Hirsch, Mangala Narasimhan, James M. Crawford, Thomas McGinn, Karina W. Davidson, *Presenting Characteristics, Comorbidities, and Outcomes Among 5,700 Patients Hospitalized With COVID-19 in the New York City Area*, Journal of the American Medical Association, Apr.22, 2020, https://jamanetwork.com/journals/jama/fullarticle/2765184.

[21] Centers for Disease Control, *FAQs for Administrators, Staff, Incarcerated People & Family Members*, Mar. 28, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction- detention/faq.html. ("People in correctional and detention facilities are at greater risk for illnesses, such as COVID-19 because of their close living arrangement wit hother people.")

reduction.[22] In one recent case, a district court granted the defendant compassionate relief because he had served about 50% of his sentence for non-violent, financial offenses and because he was at significant risk of serious infection. *United States v. Edwards*, No. 6:17-CR-00003, 2020 WL 1650406, at *6 (W.D. Va. Apr. 2, 2020) (finding extraordinary and compelling reason for compassionate release because "[d]efendant has made a particularized showing that he is susceptible to contracting COVID-19, and that he is at high risk if he contracts it."). The Court should make a similar finding here. *Also See United States v. Tomlinson*, 17-cr-773 (N.D. Ill. Apr. 28, 2020) (Pallmeyer, J.); *see also United States v. Thompson*, 15-cr-448 (N.D. Ill. Apr. 17, 2020) (Dow, J.).

## IV.     The 3553(a) factors weigh in favor of Mr. Moreno's immediate release.

---

[22] See, e.g., United States v. Hernandez, No. 18-cr-20474, R. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer and immunosuppression and just under 12 months left to serve on 39 month sentence); Rodriguez, 2020 WL 1627331 (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, R. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); United States v. Marin, No. 15-cr-252, R. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); United States v. Muniz, Case No. 4:09-cr-199, R. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); United States v. Bolston, Case No. 1:18-cr-382-MLB, R. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); United States v. Powell, No. 1:94-cr-316-ESH, R. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); United States v. Campagna, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant); United States v. Barkman, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility").

The § 3553(a) factors weigh in favor of releasing Mr. Moreno immediately. *See* 18 U.S.C. § 3582(c)(1)(A) (directing the court to "consider the sentencing factors set forth in section 3553(a) to the extent that they are applicable."); *see also* U.S.S.G. § 1B1.13(2) (advisory guideline suggesting one factor weighing in favor of compassionate release is that "the defendant is not a danger to the safety of any other person or to the community").

As a non-violent, first time offender, the "benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave." *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020). Especially in light of the danger Mr. Moreno faces if he remains in custody, the time that he has already served is sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" under § 3553(a)(2)(A). *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020) (finding § 3553(a)(2)(A) satisfied for the purposes of compassionate release after the defendant served the majority of his prison sentence). The "just punishment" factor is especially important under these highly unusual circumstances. When the Court sentenced Mr. Moreno, surely "the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." *Zukerman*, 2020 WL 1659880, at *6; *see also United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006) ("There is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court.").

Keeping Mr. Moreno locked up is also not necessary "to protect the public from further crimes" under § 3553(a)(2)(C).  As the BOP has already recognized, Mr. Moreno's individual risk of recidivism is minimal. *See* Exh. A, FPC Duluth First Step Act Eligibility and Recidivism Risk Level Review.

Finally, the Court should consider that Mr. Moreno's age renders him a very low risk of recidivism under § 3553(a)(2)(C). The Sentencing Commission finds that fully 93.5% of people age 65 or older do not commit new offenses after release.[23] Sentencing Commission studies further indicate these low recidivism rates hold constant regardless of whether someone served their full-sentence or gained early release.[24] The Seventh Circuit has repeatedly affirmed reduced sentences for older individuals because the sentencing guidelines "do not factor in a defendant's age." *United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009); *see also United States v. Carter*, 538 F.3d 784, 792 (7th Cir. 2008) (affirming lower sentence for tax fraud partially based on age); *United States V. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-range sentence based solely on age).

Finally, it almost goes without saying that requiring Mr. Moreno to remain in custody will not provide him with "medical care... in the most effective manner" under § 3553(a)(2)(D). Even before the pandemic, the BOP was failing to provide adequate healthcare.[25] The situation has only worsened with the COVID-19 onslaught.[26] One recent district court judge weighed this

---

[23] U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 23, Fig. 14, Dec. 2017, https://www.ussc.gov/sites/default/files/pdf/research-and- publications/research-publications/2017/20171207_Recidivism-Age.pdf.

[24] U.S. Sentencing Commission, *Recidivism Among Federal Offenders Receiving Retroactive Sentence Reductions: The 2011 Fair Sentencing Act Guideline Amendment*, at 3, Mar. 2018, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/20180328_Recidivism_FSA-Retroactivity.pdf.

[25] U.S. Dep't of Justice, *Office of the Inspector General Review of the Federal Bureau of Prison's Medical Staffing Challenges*, at i, Mar. 2016, (describing an inability to hire a sufficient number of healthcare professionals to meet the needs of a teeming incarcerated population); *see also* Erica Zunkel, *Article: 18 U.S.C. §3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant With Rehabilitation, Training, and Treatment in "The Most Effective Manner,"* 9 Notre Dame J. Int'l & Comp. L. 49, 57–60 (2019) (detailing the BOP's systematic failure to procure healthcare for inmates).

[26] Lisa Freeland et al, *We'll See Many More COVID-19 Deaths in Prison if Congress and Barr Don't Act Now*, WASH. POST, Apr. 6, 2020, https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisons-argues-releasing- at-risk-offenders ("Numerous credible public-health experts have observed that overcrowded prisons with communal living; shared toilets, showers, and sinks; poor sanitation; and wholly inadequatemedicalcarewouldallowcovid-19tosweepthroughtheprisonpopulationfarmore quickly than the general public — with devastating consequences."); *see also* Joe Davidson, *Unions for Prison, VA Workers File"ImminentDanger"Reports about Coronavirus Conditions*, WASH. POST, Apr. 9, 2020,

factor in granting compassionate release to an elderly defendant with underlying conditions, concluding that the defendant was "unlikely to be able to get the medical care he needs in the midst of an ongoing pandemic." *United States v. Burrill*, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020). Further, BOP staff recently filed a complaint with the Occupational Safety and Health Administration, contending that various BOP policies "are proliferating the spread of a known and deadly contagion both within our prisons system and to our surrounding communities."[27] Living in his own home with access to health care provided through Medicare would dramatically reduce Mr. Moreno's risk of infection due to COVID-19 and would set up him for success as he re-enters society.

## Conclusion

For the foregoing reasons, Mr. Moreno respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) to time served. Should the Court wish to hold a hearing on this motion, counsel waives Mr. Moreno's appearance.

By: */s/Richard Kling*
Richard S. Kling
The C-K Law Group of Chicago-Kent
565 West Adams Street, Suite 600
Chicago, Illinois 60661


By: *Isabella Romano*
    *Benjamin Jambois*
    *Emily Motin*
    *Hailee Mckie*
Law Students
The C-K Law Group of Chicago-Kent

---

https://www.washingtonpost.com/politics/unions-for-prison-va-workers-file-imminent-danger-reports-about-coronavirus-conditions/2020/04/08/78962ea0-79e4-11ea-8cec-530b4044a458_story.html.

[27] Council of Prison Workers 33, *Imminent Danger Report*, at 3, Mar. 31, 2020, available at https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf (describing BOP's policy of requiring staff to appear for work within 48 hours even after having contact with individuals showing symptoms of COVID-19, and BOP's policy of continuously moving infected defendants).

565 West Adams Street, Suite 600
Chicago, Illinois 60661

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, Richard Kling, an attorney, hereby certifies that, in accordance with FED. R. CRIM P. 49, FED. R. CIV. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## <u>DEFENDANT MORENO'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE OR RECOMMENDATION FOR IMMEDIATE HOME CONFINEMENT</u>

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on May 4, 2020, to counsel/parties that are non-ECF filers.

17

By: /s/*Richard Kling*
Richard S. Kling
The C-K Law Group of Chicago-Kent
565 West Adams Street, Suite 600
Chicago, Illinois 60661


By: *Isabella Romano*
   *Benjamin Jambois*
   *Emily Motin*
   *Hailee Mckie*
Law Students
The C-K Law Group of Chicago-Kent
565 West Adams Street, Suite 600
Chicago, Illinois 60661


**EXHIBITS:**

| Exhibit | Title |
| --- | --- |
| A | FPC Duluth First Step Act Eligibility and Recidivism Risk Level Review |
| B | Summary Reentry Plan |
| C | Mr. Moreno's Request for Compassionate Release |
| D | Warden Review |
| E | Office of the General Counsel Denial |

Exhibit A

DATE REVIEWED: 11-16-2019

INSTITUTION: FPC-Duluth          UNIT:       Great Lakes E

INMATE NAME: Moreno, Joseph      REG NO:     44753-424

FIRST STEP ACT (Circle One):          ELIGIBLE      /      INELIGIBLE

RECIDIVISM RISK LEVEL (Circle One):      MINIMUM   LOW   MEDIUM      HIGH

H C 662/3

8-16-2021

Exhibit B



## Summary Reentry Plan - Progress Report

SEQUENCE: 00091037

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: MORENO, JOSEPH MARIO  44753-424

Report Date: 02-27-2019



| | | | |
|---|---|---|---|
| Facility: | DTH  DULUTH FPC | Custody Level: | OUT |
| Name: | MORENO, JOSEPH MARIO | Security Level: | MINIMUM |
| Register No.: | **44753-424** | Proj. Rel Date: | 12-01-2023 |
| Quarters: | E01-105L | Release Method: | GCT REL |
| Age: | 66 | DNA Status: | DTH02866 / 04-21-2014 |
| Date of Birth: | 08-27-1952 | | |

### Contact Information

Release contact & address
Jackie  Moreno, IN-LAW SISTER
5224 S Mayfield Ave, Chicago, IL 60638 US
Phone (home) : 773-440-2468

### Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 18:1951(A) CONSPIRACY TO COMMIT EXTORTION CNT.5 | 132 MONTHS |

Date Sentence Computation Began:     04-21-2014
Sentencing District:     ILLINOIS, NORTHERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /    0 /    14 | 202 | Years: 4 Months: 10 Days: 8 | +1    JC - 0       InOp |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

### Program Plans

Inmate Moreno arrived at FPC Duluth on November 14, 2018. He was encouraged to satisfy his court-imposed financial obligations through participation in the Inmate Financial Responsibility Program and maintain clear conduct. Inmate Moreno was recommended to complete all six core topics of the Release Preparation Program (RPP) prior to RRC placement.

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| DTH | REC AM | RECREATION DETAIL | 01-03-2019 |

### Work Assignment Summary

Inmate Moreno has consistently earned average and above average work evaluations during this period of incarceration. He has gained employable work skills through his employment in Recreation.

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| DTH | ESL HAS | ENGLISH PROFICIENT | 04-30-2014 |
| DTH | GED HAS | COMPLETED GED OR HS DIPLOMA | 04-30-2014 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| DTH | | PUBLIC SPEAKING | 01-08-2019 | CURRENT |
| DTH | C | TOASTMASTERS INTL (SPEAKING) | 03-24-2017 | 01-08-2019 |
| DTH | C | RPP1 HIV AWARENESS VIDEO | 12-12-2018 | 12-12-2018 |
| DTH | C | RPP 6 VICTIM AWARENESS | 12-19-2014 | 03-15-2015 |
| DTH | C | POWER YOGA | 04-05-2017 | 06-29-2017 |
| DTH | C | THE NATIONAL PARKS | 04-07-2017 | 06-28-2017 |
| DTH | C | RPP1 HEALTH & NUTRITION | 04-07-2017 | 06-27-2017 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 04-07-2017 | 06-27-2017 |
| DTH | C | RPP 2 BASIC TYPING | 04-10-2017 | 06-26-2017 |



## Summary Reentry Plan - Progress Report

**SEQUENCE: 00091037**

Dept. of Justice / Federal Bureau of Prisons

**Report Date: 02-27-2019**

Plan is for inmate: MORENO, JOSEPH MARIO  44753-424

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| DTH | C | DRIVER'S LICENSE WORKSHOP | 05-08-2017 | 05-09-2017 |
| DTH | C | PUBLIC SPEAKING | 04-10-2017 | 05-11-2017 |
| DTH | C | POWER YOGA | 01-06-2017 | 03-29-2017 |
| DTH | C | ASTROPHYSICS & COSMOLOGY | 01-05-2017 | 03-22-2017 |
| DTH | C | RPP1 HEALTH & NUTRITION | 01-02-2017 | 03-21-2017 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 01-03-2017 | 03-21-2017 |
| DTH | C | RPP 2 BASIC TYPING | 01-02-2017 | 03-22-2017 |
| DTH | C | GOAL SETTING | 01-02-2017 | 03-17-2017 |
| DTH | C | SUCCESSFUL RELEASE PLANNING | 02-07-2017 | 02-07-2017 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 10-21-2016 | 12-23-2016 |
| DTH | C | ASTROPHYSICS & COSMOLOGY | 10-19-2016 | 12-21-2016 |
| DTH | C | RPP1 HEALTH & NUTRITION | 10-18-2016 | 12-20-2016 |
| DTH | C | A GENERAL STUDY OF FILM | 10-18-2016 | 12-20-2016 |
| DTH | C | POWER YOGA | 10-12-2016 | 12-28-2016 |
| DTH | C | HATHA YOGA | 10-12-2016 | 12-28-2016 |
| DTH | C | SILVER AGE YOGA | 10-12-2016 | 12-28-2016 |
| DTH | C | RPP 2 BASIC TYPING | 07-25-2016 | 10-14-2016 |
| DTH | C | RPP1 HEALTH & NUTRITION | 07-25-2016 | 10-04-2016 |
| DTH | C | RPP 6 PARENTING | 07-25-2016 | 10-04-2016 |
| DTH | C | ASTROPHYSICS & COSMOLOGY | 07-25-2016 | 09-28-2016 |
| DTH | C | RPP 2 RESUME WORKSHOP | 07-25-2016 | 09-06-2016 |
| DTH | C | RPP 2 BASIC TYPING | 04-05-2016 | 07-20-2016 |
| DTH | C | ASTROPHYSICS & COSMOLOGY | 04-05-2016 | 07-19-2016 |
| DTH | C | EVENTS THAT CHANGED HISTORY | 04-06-2016 | 07-19-2016 |
| DTH | C | RPP1 HEALTH & NUTRITION | 04-05-2016 | 07-19-2016 |
| DTH | C | LIFE LESSONS FROM GREAT BOOKS | 04-05-2016 | 07-19-2016 |
| DTH | C | RPP 2 SURVEY OF THE TRADES | 04-05-2016 | 07-19-2016 |
| DTH | C | POWER YOGA | 04-13-2016 | 06-27-2016 |
| DTH | C | SILVER AGE YOGA | 04-13-2016 | 06-27-2016 |
| DTH | C | RPP 2 BASIC TYPING | 12-29-2015 | 03-18-2016 |
| DTH | C | LIFE LESSONS FROM GREAT BOOKS | 12-21-2015 | 04-01-2016 |
| DTH | C | BUSINESS STRATEGY: PORTER | 12-21-2015 | 03-25-2016 |
| DTH | C | HISTORY OF THE ANCIENT WORLD | 12-21-2015 | 03-30-2016 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 12-21-2015 | 03-30-2016 |
| DTH | C | GOAL SETTING | 12-21-2015 | 03-29-2016 |
| DTH | C | STEP CLASS | 12-21-2015 | 03-22-2016 |
| DTH | C | POWER YOGA | 12-21-2015 | 03-22-2016 |
| DTH | C | HATHA YOGA | 12-21-2015 | 03-22-2016 |
| DTH | C | CHESS BASICS | 10-05-2015 | 12-15-2015 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 10-05-2015 | 12-15-2015 |
| DTH | C | SILVER AGE YOGA | 09-30-2015 | 12-19-2015 |
| DTH | C | HATHA YOGA | 09-30-2015 | 12-19-2015 |
| DTH | W | STEP CLASS | 06-29-2015 | 09-26-2015 |
| DTH | W | HATHA YOGA | 06-29-2015 | 09-26-2015 |
| DTH | C | RPP 2 BASIC TYPING | 06-15-2015 | 09-14-2015 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 07-07-2015 | 09-09-2015 |
| DTH | C | BUSINESS DECISION MAKING | 04-15-2015 | 06-15-2015 |
| DTH | C | STEP CLASS | 03-30-2015 | 06-20-2015 |
| DTH | C | HATHA YOGA | 03-30-2015 | 06-19-2015 |
| DTH | C | SILVER AGE YOGA | 03-30-2015 | 06-19-2015 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 04-01-2015 | 06-15-2015 |
| DTH | C | RPP 2 BASIC TYPING | 04-01-2015 | 04-12-2015 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 12-18-2014 | 01-05-2015 |
| DTH | C | BUSINESS STRATEGY: PORTER | 12-18-2014 | 03-13-2015 |
| DTH | C | SUCCESSFUL RELEASE PLANNING | 12-19-2014 | 02-26-2015 |
| DTH | C | RPP 2 FINANCIAL OBLIGATIONS | 12-19-2014 | 03-25-2015 |
| DTH | C | STEP CLASS | 12-27-2014 | 03-21-2015 |



## Summary Reentry Plan - Progress Report
### Dept. of Justice / Federal Bureau of Prisons
**Plan is for inmate: MORENO, JOSEPH MARIO  44753-424**

SEQUENCE: 00091037
Report Date: 02-27-2019

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| DTH | C | RPP 6 THINKING ERRORS | 12-19-2014 | 03-04-2015 |
| DTH | C | RPP 6 RECOVERY & RELAPSE | 12-19-2014 | 03-02-2015 |
| DTH | C | SUCCESSFUL RELEASE PLANNING | 10-23-2014 | 10-23-2014 |
| DTH | C | RPP 6 POSITIVE ATTITUDE | 09-22-2014 | 12-05-2014 |
| DTH | C | RPP 2 COMPUTER TUTORIALS | 06-16-2014 | 09-05-2014 |
| DTH | C | RPP 3 PERSONAL FINANCE | 06-09-2014 | 09-05-2014 |
| DTH | C | RPP1 HEALTH & NUTRITION | 06-09-2014 | 08-25-2014 |
| DTH | C | RPP6 ASSERTIVENESS TRAINING | 07-11-2014 | 08-29-2014 |
| DTH | C | RPP 6 EMPOWERMENT STRATEGIES | 07-09-2014 | 08-27-2014 |
| DTH | C | RPP 6 ANGER MANAGEMENT | 07-07-2014 | 08-25-2014 |

### Education Information Summary

| He has High School Diploma. |
|---|

### Discipline Reports

| Hearing Date | Prohibited Acts |
|--------------|-----------------|
| 12-28-2016 | 331 : POSSESSNG A NON-HAZARDOUS TOOL |
| 06-20-2016 | 407 : VIOLATING VISITING REGULATIONS |
| 11-21-2014 | 312 : BEING INSOLENT TO STAFF MEMBER |

### Discipline Summary

| Last incident report on December 23, 2016, for Code-331. |
|---|

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 01-03-2019 | CURRENT |
| DTH | A-DES | TRANSFER RECEIVED | 11-14-2018 | 01-03-2019 |
| DEV MED | A-DES | OTHER AUTH ABSENCE RETURN | 07-10-2018 | 09-21-2018 |
| DEV MED | A-DES | OTHER AUTH ABSENCE RETURN | 06-07-2018 | 07-10-2018 |
| DEV MED | A-DES | OTHER AUTH ABSENCE RETURN | 04-13-2018 | 06-07-2018 |
| DEV MED | A-DES | OTHER AUTH ABSENCE RETURN | 03-05-2018 | 04-13-2018 |
| DEV MED | A-DES | OTHER AUTH ABSENCE RETURN | 02-21-2018 | 02-26-2018 |
| DEV MED | A-DES | OTHER AUTH ABSENCE RETURN | 01-12-2018 | 02-21-2018 |
| DEV MED | A-DES | TRANSFER RECEIVED | 08-31-2017 | 11-30-2017 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 04-25-2017 | 08-09-2017 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 03-16-2017 | 04-25-2017 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 03-08-2017 | 03-16-2017 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 02-24-2017 | 03-08-2017 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 02-17-2017 | 02-24-2017 |
| DTH | A-DES | FURLOUGH RETURN | 01-10-2017 | 02-17-2017 |
| DTH | A-DES | FURLOUGH RETURN | 12-05-2016 | 01-10-2017 |
| DTH | A-DES | FURLOUGH RETURN | 08-24-2016 | 12-05-2016 |
| DTH | A-DES | FURLOUGH RETURN | 08-05-2016 | 08-24-2016 |
| DTH | A-DES | FURLOUGH RETURN | 07-26-2016 | 08-05-2016 |
| DTH | A-DES | FURLOUGH RETURN | 07-13-2016 | 07-26-2016 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 07-03-2016 | 07-13-2016 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 06-07-2016 | 07-02-2016 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 05-03-2016 | 06-07-2016 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 04-19-2016 | 05-03-2016 |
| DTH | A-DES | FURLOUGH RETURN | 02-23-2016 | 04-19-2016 |
| DTH | A-DES | FURLOUGH RETURN | 12-11-2015 | 02-23-2016 |
| DTH | A-DES | FURLOUGH RETURN | 11-19-2015 | 12-11-2015 |
| DTH | A-DES | FURLOUGH RETURN | 11-16-2015 | 11-19-2015 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 11-07-2015 | 11-16-2015 |
| DTH | A-DES | FURLOUGH RETURN | 11-02-2015 | 11-05-2015 |



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: MORENO, JOSEPH MARIO  44753-424

SEQUENCE: 00091037
Report Date: 02-27-2019

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| DTH | A-DES | FURLOUGH RETURN | 09-29-2015 | 11-02-2015 |
| DTH | A-DES | FURLOUGH RETURN | 09-22-2015 | 09-29-2015 |
| DTH | A-DES | FURLOUGH RETURN | 07-30-2015 | 09-22-2015 |
| DTH | A-DES | FURLOUGH RETURN | 06-17-2015 | 07-30-2015 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 02-05-2015 | 06-17-2015 |
| DTH | A-DES | OTHER AUTH ABSENCE RETURN | 07-21-2014 | 02-05-2015 |
| DTH | A-DES | US DISTRICT COURT COMMITMENT | 04-21-2014 | 07-21-2014 |

### Current Care Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| CARE1-MH | CARE1-MENTAL HEALTH | 03-24-2017 |
| CARE2 | STABLE, CHRONIC CARE | 07-17-2018 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| LOWER BUNK | LOWER BUNK REQUIRED | 12-11-2018 |
| NO PAPER | NO PAPER MEDICAL RECORD | 08-31-2017 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 09-07-2017 |
| SOFT SHOES | SOFT SHOES ONLY | 12-11-2018 |
| YES F/S | CLEARED FOR FOOD SERVICE | 09-07-2017 |

### Current PTP Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|

*NO ASSIGNMENTS*

### Current Drug Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| DAP DIAG | DRUG ABUSE DIAGNOSIS PENDING | 02-10-2017 |
| ED COMP | DRUG EDUCATION COMPLETE | 02-20-2015 |

### Physical and Mental Health Summary

Inmate Moreno is on regular duty with medical restrictions. Psychology staff have not expressed mental health concerns at this time. He has completed Drug Education Program.

### FRP Details

Most Recent Payment Plan

**FRP Assignment:** **COMPLT**   **FINANC RESP-COMPLETED**   **Start: 06-25-2016**

| | | | |
|---|---|---|---|
| Inmate Decision: **AGREED** | **$25.00** | Frequency: **MONTHLY** | |
| Payments past 6 months: **$0.00** | | Obligation Balance: **$0.00** | |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|-----|------|--------|---------|---------|--------|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | REST FV | $134,192.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |

### Financial Responsibility Summary

At the time of sentencing, inmate Moreno was ordered to pay a $100 felony assessment & a restitution of $134,192.00.

### Release Planning

He plans to reside with his sister-in-law in Chicago, IL.

### General Comments

In preparation for RRC placement and reintegration in the community, inmate Moreno has secured his social security card, driver's license, and birth certificate. Additionally, inmate Moreno has been recommended to complete the Financial Obligations class to educate him on

**Exhibit C**

February 23, 2019

Ms. M. Rios, Warden
Federal Prison Camp
FPC Duluth
P.O. Box 1000
Duluth, MN 55814

RE: Request For Release Pursuant To
"The First Step Act" Effective
Due Date Of December 21, 2018
Under 4(b) Of 18 USC §3582 And
§4205(g) "Elderly Inmates With
Medical Conditions"

Dear Warden Rios,

In accordance with the First Step Act of 2018 which was signed into law on December 21, 2018, I am hereby requesting and making application to be released pursuant to Program Statement No. 5050.50, as amended dated January 17, 2019 under Section §4(b) "Elderly Inmates With Medical Conditions."

This program is not a pilot program, but a provision as set forth in "The First Step Act." In support thereof, I submit the following:

1) I will be 67 years old on August 27, 2019,

2) I suffer from chronic and serious medical conditions related to the aging process, as follows:

During my youth I have been diagnosed with polio, age 1½-2 years; I suffered with appendicitis and had surgery in 1968; In the same year, I was diagnosed with a hydrocele of the scrotum and malignant, cancerous tumor on the right testicle; In 1979 I contracted and was treated for tuberculosis.

I have also been diagnosed with high cholesterol; high blood pressure; glaucoma; a spot in my lung which requires frequent catscans; and cluster headaches. Since being imprisoned, I have been treated with anxiety medications for sleep disorders all of which are related to post-traumatic stress disorder (PTSD) due to the jolts and shock to my nervous system, because of trama from the indictment and severe stress since July, 2012.

I am still symptomatic of this mental illness and it is only exaserbated by my continued incarceration. I have had surgery for a full knee replacement of my left knee, after having been diagnosed with end-stage oesteoarthritis.

I am presently experiencing severe pain and arthritis in my right knee which

Pg. 1 of 3

will require extensive and prolonged treatment. I am currently on the following medications: Timolol maleate; for treating glaucoma, Pravastatin; for high cholesterol, Linospril; for high blood pressure, Buspirone Mirzatapine (Remron) and Sertraline (Zoloft); for treatment of anxiety and mental disorders, lack of sleep, cold sweats, nightmares, Omeprazole; for acid reflux; Ferrous Gluconate; for low blood iron; aspirin, 18 MG; to prevent heart attacks; hearing aids; for loss of hearing; eyeglasses and exams; by an outside opthamologist. I have chronic allergies and I have noticed short-term memory loss. I have also had surgery for a hernia while incarcerated.

3) None of these conditions will improve with age and the treatment that I receive while here. Most, if not all, of these conditions will continue to deteriorate, will not improve and will negatively progress with age. I am experiencing deteriorating mental and physical health which substantially diminishes my ability to function in this correctional facility.

   While here, Joseph my son, age 29, and my brother Alex have both passed away on 12/22/18 and 2/7/19 respectively.

4) The conventional treatment that I have received from the BOP promises no substantial improvement for either my mental or physical conditions.

5) I have already served at least 50% of my sentence.

If release is granted, the BOP would realize a substantial savings during the short and long term of my remaining sentence. I am a first-time, non-violent offender. I will be receiving Social Security and Medicare and I also am able to find gainful employment, and a home with family upon release.

I was 59 years old at the time of my indictment and prior to that time, I was diagnosed with only high blood pressure and cholesterol, acid reflux, glaucoma and deteriorating eyesight. Since my indictment and incarceration, I have reviewed the circumstances and lifestyle which gave rise to my offenses and have learned that not only was I stupid and reckless at that time, but I was living an offtrack life.

I had everything I wanted and took for granted those things that I needed; (5) beautiful children (now I have 3 grandchildren).

I have reignited my spirituality with our Creator by attending mass every Thursday, Eucharistic services every Sunday, joined the Legion of Mary (A Rosary prayer group), completed Bible studies and have been actively participating as a lecturer during church services. I have also sponsored (2) inmates for their baptism and/or confirmation, all while being very productive while in prison.

I have facilitated classes such as Health and Nutrition, Lessons from the Great Books, Through The Wormhole, National Parks and have taught and lectured the Positive Mental

Attitude class. I have taken many other classes and have become a better person because of all of the above.

In addition, I am a charter (founding) member of Toastmasters. All of this service can be verified by my transcripts and Mr. Eng.

In addition, I will be eligible to qualify under "The Second Chance Reauthorization Act of 2018" which also allows release of inmates who are 60 years old and who have served 2/3rds of their sentence including, but not limited to, 6 months of Home Confinement and up to 6-12 months of Second Chance relief.

I was sentenced to 11 years (132 months) and the new law clearly states that all inmates are to receive an additional (7) days for a total of 54 days each year served or portion thereof, totaling 9.9 months credit for Good Time served.

In sum, my original sentence was for a period of 132 months. I will have, as of April 2019, served 60 months. Given the credit of 9.9 months of Good Time, and the minimum of 6-12 months Second Chance and 6 months Home Confinement - (not including additional credit for Good Time to be earned).

I will have served an additional 21.9 months for a total of 81.9 months to date. This section will take affect for my alternative release in less than 6 months.

In anticipation of your consideration, I thank you in advance.


Joseph Mario Moreno
ID# 44753-424


CC: Asst. Warden Cole

**Exhibit D**



**U.S. Department of Justice**
**Federal Bureau of Prisons**

Federal Prison Camp

_Duluth, MN 55814_

March 8, 2019

MEMORANDUM FOR MORENO, JOSEPH MARIO
Reg. No. 44753-424

FROM:            M. Rios, Warden

SUBJECT:         Reduction In Sentence Request

Your request for a Reduction of Sentence (RIS), for elderly inmates with medical conditions, has been reviewed in accordance with Program Statement 5050.50, <u>Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. 3582 and 4205(g)</u>.

Based on the review, it has been determined your RIS request will be forwarded to the Central Office for further review.

In the event you are not satisfied with this response, you may file an Administrative Remedy within 20 calendar days by submitting a BP-229 to the Warden.

If you have any further questions, please do not hesitate to contact the Reduction in Sentence Coordinator, M. Jones, in building 211.

Inmate Provided copy on ___3-13-19___ by _____
                         DATE                STAFF

(Ex "B")

OVER

Exhibit E



**U.S. Department of Justice**

Federal Bureau of Prisons

Office of the General Counsel                    *Washington, DC 20534*

JUL 15 2019

MEMORANDUM FOR M. RIOS, WARDEN
                FEDERAL PRISON CAMP
                DULUTH, MINNESOTA

FROM:       Ken Hyle
            Assistant Director/General Counsel

SUBJECT:    MORENO, Joseph
            Federal Register No. 44753-424
            Request for Reduction in Sentence

Please be advised that Mr. Moreno's request for a reduction in
sentence (RIS) pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and PS
5050.50, Compassionate Release/Reduction in Sentence: Procedures
for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g),
Section 4(b)("Elderly Inmates with Medical Conditions"), is
denied. We have carefully reviewed the documentation
accompanying this request and have consulted with the Medical
Director of the Bureau of Prisons.

Section 4(b) of PS 5050.50 provides that an inmate who meets the
following criteria may be considered for a RIS: (1) is age 65
and older; (2) suffers from chronic or serious medical
conditions related to the aging process; (3) is experiencing
deteriorating mental or physical health that substantially
diminishes his ability to function in a correctional facility;
(4) conventional treatment promises no substantial improvement
to his mental or physical condition; and (5) has served at least
50 percent of his sentence.

Mr. Moreno, age 66, has a history of hypertension, esophageal
reflux, anemia, and bipolar disorder. Although his medical
conditions are considered chronic, they are currently stable and
well controlled. Mr. Moreno is capable of performing his
Activities of Living (ADLs) and Instrumental Activities of Daily
Living (IADLs), including navigating the correctional
environment, independently. Mr. Moreno is not prescribed any
adaptive equiptment, and has no medical restrictions.

OVER                              (EX "E")